355 Mass. 245                                                    245

I. Baron & Sons, Inc. *v.* Eastern Storage Industrial Park Corp.

I. Baron & Sons, Inc. *vs.* Eastern Storage Industrial
Park Corp.

(and a companion case[1]).

Suffolk.    November 8, 1968. — January 30, 1969.

Present: Wilkins, C.J., Whittemore, Cutter, Kirk, & Spiegel, JJ.

*Negligence,* Flammable substance, Violation of law.    *Fire Prevention.
Flammable Substance.*

In actions against a public warehouseman for damage to the plaintiffs'
property from a fire on the defendant's premises of unknown and
undeterminable origin which became so intense that flammable
liquids stored in steel drums on the premises boiled and vaporized
and burst the drums and spread the fire to the plaintiffs' property, a
conclusion of an auditor that such damage was caused by negligence
on the part of the defendant in that it had "stored an excessive quan-
tity of flammables" on the premises was not warranted where it
appeared that the quantity stored on the premises of the only flam-
mable liquid having a flash point within the coverage of a local or-
dinance was far less than the quantity permitted by a storage license
issued for the premises under G. L. c. 148, § 13, that regulations
promulgated by the Board of Fire Prevention in the Department of
Public Safety under §§ 9, 10, and 13, were not applicable to such
licensed premises, and that there was no other standard on which the
auditor's finding could be supported.

Two actions of tort.    Writs in the Superior Court dated
January 31, 1963, and September 24, 1963.

Following the report of an auditor, the actions were tried
before *Lurie, J.*

*William Coniaris* for the plaintiffs.

*William J. McCluskey (Paul V. Salter* with him) for the
defendant.

Kirk, J.    On Monday, November 12, 1962, a holiday,
a fire of unknown origin occurred on the premises of the
defendant Eastern Storage Industrial Park Corp. (Eastern),

---

[1] I. Baron & Sons, Inc. and White Star Bedding Corp. *vs.* Eastern Storage
Industrial Park Corp.

a public warehouseman located at Everett Avenue and Maple Street, Chelsea. The plaintiff White Star Bedding Corp. (White Star) was a tenant of Eastern and occupied and stored its machinery and equipment in one of the buildings destroyed by the fire. From Eastern's premises the fire spread to nearby premises owned and occupied by the plaintiff I. Baron & Sons, Inc. (Baron), and consumed the Baron buildings and contents.

As a result of the fire several actions at law in multiple counts were commenced against Eastern and others.[2] All were consolidated for trial and referred to an auditor, findings of fact not to be final. The auditor found that Eastern was liable in tort for negligence to Baron and to White Star.[3] At the trial before a jury the plaintiffs introduced the auditor's report and other evidence through several witnesses.[4] Eastern rested at the close of the plaintiffs' evidence and moved for directed verdicts which, subject to the plaintiffs' exceptions, were ordered to be returned. The case is before us on the plaintiffs' amended consolidated bill of exceptions.

The parties agree that the decisive issue raised by the exceptions is whether certain of the auditor's conclusions which led to his ultimate finding of negligence are supported by his subsidiary findings. Our analysis of the subsidiary findings made by the auditor will perhaps be better understood if we now state his conclusions: 1. The original cause of the fire was unknown and undeterminable. 2. Eastern stored an excessive quantity of flammables in a structure on its premises called Building 9 Extension. 3. The excessive storage was an act of negligence. 4. This negligence was the effective cause of the damage suffered by the plaintiffs. 5. Eastern was not negligent in any other respect.

---

[2] Judgments have been entered for all defendants except Eastern.

[3] The findings were made on three counts brought by Baron (all for the same cause of action) and on two counts brought by White Star (both for the same cause of action).

[4] The testimony of these witnesses when subject to cross-examination deprived the auditor's report of its compelling effect but left it as evidence to be considered as the only evidence in the case in support of the plaintiffs' causes of action.

The auditor appended to his report a diagrammatic sketch of the locus showing the location of the several structures and the distribution in them of various materials. In contemplation of the view which we take of the case, it is unnecessary to reproduce the sketch. A total of at least ten and perhaps fifteen buildings were burned in the fire. All of the buildings were of wood construction with the single exception of one of the buildings occupied by White Star which was built of brick. The auditor made elaborate and painstaking findings describing in detail the progress and course of the fire and assigning the probable causes for its intensity and rapid spread. Again, because of the view we take of the case, no purpose will be served by setting out these findings in full.

The auditor states that he used the words "flammable" and "inflammable" synonymously. It appears also that he used the words "fluid" and "liquid" interchangeably.

We summarize the findings. Continuously since December 20, 1948, and at the time of the fire Eastern held a license granted by the city of Chelsea under G. L. c. 148, § 13, to store flammables. One of Eastern's customers was Monsanto Chemical Corp. (Monsanto) whose finished products, manufactured at its Everett plant, were stored at Eastern when space was available pending shipment to Monsanto's customers. The turnover period of Monsanto's products in storage was several weeks or less. Eastern's employees took charge of the products when delivered on trucks at the plant for storage and placed them on trucks when shipped elsewhere from storage. Neither the containers delivered to Eastern nor the documents which accompanied them disclosed the "flash points" of the contents. None of the containers bore any markings suggesting that the contents were flammable. There was no requirement of law, or regulation or ordinance or otherwise that containers of fluids of the type stored by Eastern be marked or that the documents accompanying them bear any notation of their flammability.

In rating the fire hazard of flammable liquids, "flash

points" are commonly used. "The 'flash point' of a liquid
is the temperature to which the liquid must be heated so
that vapors emanating from the surface and mixing with
air will form a combustible mixture which will flash for an
instant when a source of ignition is passed through it."

The Revised Ordinances of Chelsea at the time of the
fire classified flammables, in Fahrenheit degrees, in three
classes: Class I were liquids with flash points below 25°;.
Class II were liquids with flash points above 25° and below
70°; Class III were liquids with flash points above 70° and
below 200°.

The liquids stored on Eastern's premises by Monsanto at
the time of the fire, all in closed, fully filled 55 gallon steel
drums, are listed in the following table which states the
flash point and the number of gallons of each liquid.[5]

| Name | Gallons | Flash Point |
|---|---|---|
| Dicyclohexylamine | 10,175 | 210° F+ |
| Santicizer 405 | 8,745 | 350° F+ |
| Santicizer 406 | 12,320 | 350° F+ |
| Santicizer 409 | 14,520 | 350° F+ |
| Santicizer 411 | 7,315 | 350° F+ |
| Santicizer 261 | 9,240 | 350° F+ |
| Tetrapropenyl Succinic Anhydride (TPSA) | 8,745 | 352° F+ |
| Tetraethyl-orthosilicate (TEOS) | 3,795 | 125° F |
| TOTAL | 74,855 | |

"Another classification, based on flash points, was made
by regulations of the Board of Fire Prevention of the Com-
monwealth's Department of Public Safety. These regula-
tions, in force at the time of the fire, were issued under
G. L. c. 148, §§ 9 and 10, and governed 'the keeping, storage,
manufacture or sale, in limited quantities of flammable

---

[5] There were also solid chemical products stored in fiberboard drums or
large paper bags. These are omitted from our listing since they play no part
in the result.

fluids, solids or gasses without a license or registration or either of them.'"[6]

Still another use of flash points is made by the Interstate Commerce Commission that rules that a flammable liquid which has a flash point of 80° Fahrenheit or less must bear a conspicuous red label and cannot be carried through areas such as tunnels in interstate commerce. Such products are called "Red Label" products.

The manager of Eastern did not know anything about the State board of fire prevention flash point classifications. He told Monsanto that Eastern could handle any article except "Red Label" products. Occasionally he asked Monsanto about the flash points. The acting head of Chelsea's bureau of fire prevention made inspections of Eastern's premises from time to time prior to the fire. In these inspections nothing was disclosed which was of serious concern to the acting bureau head.

On the reverse side of the certificate of registration (a form provided by the Division of Fire Prevention of the Department of Public Safety) signed by the city clerk appear the words: "12/20/48 — Granted — License to handle and store approximately twenty thousand gallons (20,000) of Class A–B–C inflammable fluids . . . ."[7]

The first fire alarm sounded at 7:44 p.m. on Monday, November 12, 1962. Within minutes a general alarm summoned apparatus from five neighborhood communities. The

---

[6] The auditor's report continues: "By these regulations, flammable fluids were divided into three classes — A, B and C — defined in the regulations as follows:

"*Class A* (highly flammable fluids), any flammable fluid having a flash point below one hundred degrees (100°) Fahrenheit, to be ascertained by any standard closed-cup instrument.

"*Class B* (less flammable fluids), any flammable fluid having a flash point of not less than one hundred degrees (100°) Fahrenheit, nor higher than one hundred eighty-seven degrees (187°) Fahrenheit, to be ascertained by any standard closed-cup instrument.

"*Class C* (relatively safe flammable fluids), any flammable fluid having a flash point above one hundred eighty-seven degrees (187°) Fahrenheit, to be ascertained by any standard closed-cup instrument."

[7] The remainder of the statement is not stated since the auditor made no finding of noncompliance concerning it.

temperature was 41 degrees, and a seven mile an hour wind was blowing from the south. When the fire engines arrived, fire was coming through the roof at the end of Building 9 over the bays where lumber was stored. Buildings 9 and 9 Extension together formed a continuous wood frame structure with an overall length of 280 feet. Building 9 was a two-story structure; 9 Extension had one story. Running lengthwise through the entire building was a corridor, open from ground to roof, along which ran railroad tracks, also used as a driveway. On each side of the corridor, and opening on it, was a series of bays, comprising a total of forty-two bays in which Monsanto's products and other goods including lumber were stored. There were other structures similarly built on Eastern's premises. The dry wood of which these and other buildings were made was readily combustible. The stored lumber provided additional fuel. The corridors through the buildings provided drafts which contributed to the intensity of the fire and rapid spread of the blaze.

For some time, Monsanto's liquids in their metal drums made no contribution to the fire. The drums were all intact and had not leaked. As the fire continued to burn, however, "the heat inside the metal drums became so great that the contents started to boil and vaporize, but not burn since there was no oxygen within the drums. Eventually the combined pressures from the boiling and the vapors became so intense that some of the drums burst. At least 50 of them were catapulted into the air during a period of about twenty to thirty minutes, spewing their contents about. Vapors and liquids which were then released would ignite and form large balls of fire adding to the intensity of the blaze, chiefly in Building 9 Extension, and raising its temperature significantly." A few minutes after the drums began to rupture in 9 Extension the destruction of the other buildings occurred.

As stated earlier in this opinion, the auditor found that the original cause of the fire was unknown and undeterminable. The auditor correctly concluded that a finding of negligence could not be based on that circumstance. See

355 Mass. 245                                            251

I. Baron & Sons, Inc. *v.* Eastern Storage Industrial Park Corp.

*Little* v. *Lynn & Marblehead Real Estate Co.* 301 Mass. 156, 160. He did base his general finding of negligence on his finding that "Eastern stored an excessive quantity of flammables in Building 9 Extension." The report shows that there were 74,855 gallons of liquids on Eastern's premises.[8] The auditor did not expressly state the standard which he used to determine what liquids, and in what quantity, could permissibly be stored on Eastern's premises. He could not establish the standard based on his personal knowledge. Without evidence of an applicable standard his finding of an excessive quantity cannot stand. The Interstate Commerce Commission "Red Label" standard is obviously inapplicable since, among other reasons, the flash points of all of the liquids were far higher than 80° Fahrenheit. The evidence shows that there are two groups of classifications of flammables which conceivably could be applicable. The first of these is that given in the Chelsea ordinance. If the whole range of the Chelsea classification is applied as a standard, there is no foundation for a finding that an excessive quantity of flammables was stored since the liquid TEOS is the only one which falls within the whole range (Class III) and the quantity of TEOS was only 3,795 gallons out of the total on the premises.

The other conceivable classification is that given in the regulations (FPR–13) of the State board of fire prevention. If the whole range of the latter classification may be applied as the standard determinative of the liquids which could permissibly be stored in Eastern's premises the auditor's finding of excessive quantity of flammables is supportable. The 3,795 gallons of TEOS which has a flash point of 125° Fahrenheit would fall in "Class B (less flammable fluids)." All of the other fluids, having flash points well above 187° Fahrenheit would be in "Class C (relatively safe flammable fluids)." The conclusion which the auditor reached and the calculations which he made in his report leave inescapable the inference that he used the whole range of the classifica-

---

[8] Although there is no specific finding that all of these liquids were in Building 9 Extension, we think it is fair to infer that most of them were.

tion by the State board in FPR–13 as determinative of the liquids which could permissibly be stored on Eastern's premises.

The regulations referred to and relied upon by the auditor, FPR–13, however, were not applicable to land and buildings which were *licensed* to store flammable fluids. They were prepared and issued by the State board pursuant to the provisions of G. L. c. 148, §§ 9, 10, and with special reference to the second paragraph of § 13, which reads, in part: "The board may by regulation prescribe the *amount* of any of the articles named in section nine ["explosives and inflammable materials"] that may be kept in a building or other structure *without a license and registration*, or either of them" (emphasis supplied). The preamble to the board's regulations states that they are to govern the "storage . . . in limited quantities . . . of flammable fluids . . . without a license . . . ." The definitions are limited to "these . . . regulations." The classification of flammable fluids into classes A, B and C are for "these . . . regulations." Thus circumscribed the regulations continue, "In accordance with the provisions of Section 13, Chapter 148 of the General Laws, the board hereby prescribes not exceeding the following amounts of flammable fluids . . . that may be kept *without a license*, . . . provided a permit has been obtained therefor . . ." (emphasis supplied). The maximum number of gallons of liquids in classes A, B and C which may be stored under a permit is then stated.

We think that these regulations, which under G. L. c. 148, § 13, and by their own terms are so precisely limited in their application to nonlicensed premises and so all-inclusive of the fluids for which permits are required, do not establish a standard which is applicable to the holder of a license to store flammable fluids. There are other doubts. FPR–13 became effective on May 27, 1955. The original license to Eastern was issued December 20, 1948. It was annually extended by the filing of a certificate of registration. See *Saxe* v. *Street Commrs. of Boston,* 307 Mass. 495, 498. Under G. L. c. 148, § 13, as amended through St. 1951, c. 329,

"Such license shall be recorded in the office of the city or town clerk, and it shall, from the time of the granting thereof by the licensing authority, be deemed a grant attaching to the land described therein and as an incident of ownership thereof running with the land and shall not be deemed to be merely a personal privilege. . . . Any such license granted hereunder shall be subject to such conditions and restrictions as may be prescribed in the license by the local licensing authority, which may include a condition that the license be exercised to such extent and within such period as may be fixed by such authority." It is of critical importance in a license having these special characteristics that it clearly appear what is meant by the words "Class A–B–C inflammable fluids" in the Chelsea license issued to Eastern in 1948. The auditor obviously imputed to the 1948 license not merely the classification defined and made effective in FPR–13 by the State board in 1955 but likewise read into the 1948 license the limited quantities of flammables which under FPR–13 were applicable only to nonlicensed premises in 1955. It was error of law to relate back and incorporate in Eastern's license the provisions of unrelated regulations. FPR–13 was not germane as a standard to measure the liquids which could be stored under the 1948 license.

Since there was no violation of the Chelsea ordinance and since the record does not reasonably permit the application of any other standard to measure "an excessive quantity of flammables" under Eastern's license, and since the auditor could not supply it of his own knowledge, it follows that the finding of excessive quantity must fall. With it falls the finding of negligence. Inasmuch as the auditor found that "Eastern was not negligent in any other respect," the motions for directed verdicts were rightly allowed.

*Exceptions overruled.*
*Judgments for the defendant.*